**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**SHELY FOSTER**, on behalf of herself and all others similarly situated,

Plaintiff,

v.

**VALSOFT CORPORATION INC. d/b/a ALLTRUST NETWORKS,**

Defendant.

Case No. 1:25-cv-409

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT**

Shely Foster ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Valsoft Corporation, Inc., d/b/a AllTrust Networks ("AllTrust" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

**NATURE OF ACTION**

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. AllTrust is a financial solutions software company based in Virginia which operates the largest consumer-based biometric database in the US, with over 9 million enrolled customers.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") of millions of individuals. But Defendant lost control over that data when

[1] *How we started,* ALLTRUST NETWORKS, https://www.alltrustnetworks.com/about-us/ (last visited March 5, 2025).

cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. In February 2024 or December 2024,[2] Defendant discovered that its network was accessed by an unauthorized actor between February 12, 2024 and February 15, 2024.[3] Thus, cybercriminals had access to Defendant's network for three days. In other words, Defendant had no effective means to prevent, promptly detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its customers' PII.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiff is a Data Breach victim, having received a breach notice ("the Notice"). The Notice Plaintiff received is attached as Exhibit 1. She brings this class action on behalf of herself, and all others harmed by Defendant's misconduct.

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8. Plaintiff, Shely Foster, is a natural person and citizen of Colorado. She resides in Denver, Colorado, where she intends to remain.

---

[2] Compare *AllTrust Breach Notification,* OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ca8dde11-011d-4a5d-b088-30ad63339175.html, to the Notice Plaintiff received (Exhibit 1), and the Notice AllTrust sent to Maine residents (Exhibit 2).

[3] *AllTrust Breach Notification,* OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ca8dde11-011d-4a5d-b088-30ad63339175.html (last visited March 5, 2025).

9. Defendant AllTrust is a stock corporation incorporated under the laws of Virginia with its principal place of business at 45150 Russel Branch Parkway, Ashburn, VA 20147.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Defendant and at least one class member are citizens of different states, and there are at least 11,229 putative Class members.

11. This Court has personal jurisdiction over Defendant because it has its principal place of business in Virginia, regularly conducts business in Virginia, and has sufficient minimum contacts in Virginia.

12. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### *Defendant Collected and Stored the PII of Plaintiff and the Class*

13. AllTrust is a financial solutions software company that pioneered the use of biometric ID as a way to prevent fraud.[4] AllTrust was acquired by Aspire USA, LLC ("Aspire") in 2020,[5] and Aspire now serves as the operational arm of AllTrust, managing AllTrust's global portfolio of software companies.[6] Aspire claims to have implemented "industry best practices."[7]

---

[4] *How we started,* ALLTRUST NETWORKS, https://www.alltrustnetworks.com/about-us/ (last visited March 5, 2025).
[5] *AllTrust Networks,* ASPIRE SOFTWARE, https://www.aspiresoftware.com/companies/alltrust-networks/ (last visited March 5, 2025).
[6] *About Aspire Software,* ASPIRE SOFTWARE, https://www.aspiresoftware.com/about/ (last visited March 5, 2025).
[7] *Id.*

14. AllTrust operates the largest consumer-based biometric database in the US, with over 9 million enrolled customers.[8] With products like Paycheck Secure and Retail Connect, thousands of merchants and retailers nationwide use AllTrust for risk management and check processing.[9] AllTrust boasts having processed over $55,000,000,000 of checks.[10] Therefore, as part of its business, Defendant receives and maintains the PII of millions of individuals.

15. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

16. Indeed, Defendant acknowledges these duties in its "Privacy Policy," claiming:

a. "Valsoft Corporation Inc. ("Valsoft") and each of its affiliates (collectively, the "Valsoft Group") is committed to safeguarding your privacy and personal data."

b. "We will only share personal data with others when we are legally permitted to do so. When we share data with others, we put contractual arrangements and security mechanisms in place as appropriate to protect the data and to comply with data protection, confidentiality and security requirements under applicable data protection laws."

c. "When transferring your personal data outside the UK or the EEA, we will comply with our legal and regulatory obligations in relation to your personal data, including having a lawful basis for transferring personal data and

---

[8] *How we started,* ALLTRUST NETWORKS, https://www.alltrustnetworks.com/about-us/ (last visited March 5, 2025).
[9] *Overview*, ALLTRUST NETWORKS LINKEDIN, https://www.linkedin.com/company/alltrust-networks/about/ (last visited March 5, 2025).
[10] *How we started,* ALLTRUST NETWORKS, https://www.alltrustnetworks.com/about-us/ (last visited March 5, 2025).

putting appropriate safeguards in place to ensure an adequate level of protection for the personal data. We will take reasonable steps to ensure the security of your personal data in accordance with applicable data protection laws."

d. "We are committed to keeping the personal data you provide to us secure and we have put in place appropriate security measures to prevent your personal data from being lost, used or accessed in an unauthorised [*sic*] way, altered or disclosed. . . . We have also implemented procedures to deal with any suspected personal data breaches and will notify you and any applicable regulator of a breach where we are required to do so."[11]

17. AllTrust also claims to have "the highest level of security and data integrity available."[12]

18. Under state and federal law, businesses like Defendant have duties to protect its customers' PII and to notify them about breaches.

***Defendant's Data Breach***

19. Between February 12, 2024 and February 15, 2024, "an unauthorized actor . . . took certain files within [Defendant's] network." Ex. 1. *See also* Notice to Maine Residents, Ex. 2.

20. It is unclear when Defendant discovered the Data Breach. In its Data Breach notification to the Maine Attorney General, Defendant states it discovered the breach approximately ten months later -- on December 6, 2024. However, in the Notice Defendant provided to Plaintiff and to affected Maine residents, Defendant claims that on February 14, 2024,

---

[11] *Privacy Policy*, VALSOFT CORPORATION, https://www.valsoftcorp.com/privacy-policy/ (last visited March 5, 2025).

[12] *How we started,* ALLTRUST NETWORKS, https://www.alltrustnetworks.com/about-us/ (last visited March 5, 2025).

it "became aware of unusual activity on a non-production computer network which is owned and managed by [its] subsidiary Aspire USA, LLC."[13]

21. Through its investigation, Defendant discovered that its network was accessed by an unauthorized actor between February 12, 2024 and February 15, 2024. Exs. 1 & 2. Thus, cybercriminals had access to Defendant's network for three days. In other words, Defendant had no effective means to prevent, promptly detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its customers' PII.

22. Worse, Defendant admitted that cybercriminals not only accessed its systems, but also "took certain files." Exs. 1 & 2.

23. Defendant's Data Breach compromised personal data including names, Social Security Numbers, driver's license numbers, and financial account information. Ex. 2.

24. Upon information and belief, the Data Breach injured at least 11,040 Texans,[14] 188 Maine residents (Ex. 2), and one Colorado resident (Plaintiff). However, given the fact AllTrust services thousands of merchants and retailers nationwide, the putative Class likely includes tens of thousands, if not hundreds of thousands, of individuals.

25. And yet, Defendant waited until February 27, 2025, before it began notifying the class—*more than a year* after cybercriminals gained access to Defendant's systems. Ex. 2.

26. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

---

[13] Compare *AllTrust Breach Notification,* OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ca8dde11-011d-4a5d-b088-30ad63339175.html, to Exhibits 1 and 2.

[14] *AllTrust Breach Report,* KEN PAXTON, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited March 5, 2025).

27. And when Defendant did notify Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

a. "remain vigilant against incidents of identity theft and fraud, [] review your account statements and monitor free credit reports for suspicious activity and to detect errors;"

b. "review the enclosed *Steps You Can Take to Help Protect Personal Information*;"

c. "enroll in the complimentary credit monitoring services we are offering to you." Exs. 1 & 2.

28. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. Therefore, Defendant caused widespread injury and monetary damages.

29. Since the breach, Defendant has declared that it has "implemented additional security measures" and is "reviewing existing security policies to further protect against similar incidents moving forward." Exs. 1 & 2. However, such security measures should have been in place before the Data Breach occurred.

30. On information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

31. Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

32. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals defeated the relevant data security systems and gained actual access to sensitive data.

33. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[15]

34. On information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

35. Plaintiff Shely Foster received notice of the Data Breach on March 3, 2025, stating her name, Social Security number, and driver's license number has been compromised.

36. Plaintiff is unsure how Defendant obtained her Private Information, however, on information and belief, Defendant obtained and maintained Plaintiff's Private Information from her current or former employer.

37. As a result, Plaintiff was injured by Defendant's Data Breach.

38. Plaintiff does not recall ever learning that her information was compromised in a data breach incident—other than the breach at issue here.

39. Plaintiff (or her third-party agent) provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain

[15] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back (last visited March 5, 2025).

Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

40. Plaintiff (or her third-party agent) reasonably understood that a portion of the funds paid to Defendant for services would be used to pay for adequate cybersecurity and protection of Private Information.

41. Upon information and belief, through its Data Breach, Defendant compromised Plaintiff's Private Information, including at least her full name, Social Security number, and driver's license number. And upon information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

42. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

43. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

44. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

45. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

46. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's Private Information right in the hands of criminals.

47. Indeed, following the Data Breach, Plaintiff began experiencing a substantial increase in spam and scam text messages, suggesting that her Private Information has been placed in the hands of cybercriminals.

48. On information and belief, Plaintiff's phone number was compromised as a result of the Data Breach, as cybercriminals are able to use an individual's Private Information that is accessible on the dark web, as Plaintiff's is here, to gather and steal even more information.

49. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

50. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

51. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

52. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

53. The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

54. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

55. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

56. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

57. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

58. Defendant disclosed the PII of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

59. Defendant's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

60. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in recent years, combined with the fact Defendant has processed over $55,000,000,000 of checks and services over 9 million customers.

61. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[16]

62. In light of ongoing high profile data breaches, including, National Public Data (2.9 billion records leaked in April 2024); Real Estate Wealth Network (1.5 billion records leaded in December 2023); AT&T (110 million customers exposed in April 2024 and January 2023); Cash App (8.2 million users exposed in April 2022); Facebook (530 million users exposed in April 2021); LinkedIn (700 million users exposed in April 2021); Wattpad (268 million records in June 2020); Advanced Info Service (8.3 billion records in May 2020); Whisper (900 million records in March 2020); and Microsoft (250 million records in December 2019), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

63. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

64. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

65. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

---

[16] *See 2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited on March 5, 2025.)

66. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[17]

67. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[18]

68. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

69. In light of the information readily available and accessible on the internet before the Data Breach, Defendant had reason to be on guard for the exfiltration of their customers' PII and given Defendant's type of business, it had cause to be particularly on guard against such an attack.

[17] Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Dec. 23, 2024).

[18] Ransomware Guide, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed Dec. 23, 2024).

70. Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

71. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its customers' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

72. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

73. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

74. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[19] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

---

[19] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

75. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

76. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

77. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

79. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-

malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

80. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

82. This framework is applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

**CLASS ACTION ALLEGATIONS**

83. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the February 2024 Data Breach discovered by Valsoft Corporation, Inc., d/b/a AllTrust Networks, including all those individuals who received notice of the breach.

84. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any

successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

85. Plaintiff reserves the right to amend the class definition.

86. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

87. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

88. Numerosity. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least 11,229 members, but is likely much larger.

89. Typicality. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

90. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

91. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

92. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device

provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

93. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

94. Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

95. Defendant owed a duty of care to Plaintiff and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

96. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

97. Defendant owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class members' PII.

98. Defendant owed—to Plaintiff and Class members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized disclosure;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

99. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

100. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

101. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

102. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship

arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

103. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

104. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

105. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

106. Defendant breached these duties as evidenced by the Data Breach.

107. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

108. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

109. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

110. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

111. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

112. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

113. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

114. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

115. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

116. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class members' sensitive PII.

117. Defendant breached its respective duties to Plaintiff and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

118. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

119. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

120. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class members would not have been injured.

121. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known

that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

122. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

123. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

124. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

125. Plaintiff and Class members (or their third-party agents) were required to provide their PII to Defendant as a condition of receiving employment provided by Defendant. Plaintiff and Class members provided their PII to Defendant or its third-party agents in exchange for Defendant's employment.

126. Plaintiff and Class members (or their third-party agents) reasonably understood that a portion of the funds paid to Defendant for services would be used to pay for adequate cybersecurity measures.

127. Plaintiff and Class members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

128. Plaintiff and the Class members (or their third-party agents) accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for employment.

129. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

130. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

131. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

132. After all, Plaintiff and Class members (or their third-party agents) would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

133. Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

134. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

135. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

136. Defendant materially breached the contracts it entered with Plaintiff and Class members (or their third-party agents) by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

137. In these and other ways, Defendant violated its duty of good faith and fair dealing.

138. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

139. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

140. Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

141. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

142. This claim is pleaded in the alternative to the breach of implied contract claim.

143. Plaintiff and Class members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their Private Information to facilitate its business, and (2) from accepting their payment.

144. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

145. Plaintiff and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

146. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

147. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

148. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class members' employment and PII because Defendant failed to adequately protect their PII.

149. Plaintiff and Class members have no adequate remedy at law.

150. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**<u>FIFTH CAUSE OF ACTION</u>**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

151. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

152. Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members,

(1) for the safeguarding of Plaintiff and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

153. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

154. Because of the highly sensitive nature of the PII, Plaintiff and Class members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

155. Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

156. Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

157. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: March 5, 2025

By: *<u>/s/ Lee A. Floyd</u>*
Lee A. Floyd (VSB No. 88459)
Justin M. Sheldon (VSB No. 82632)
**BREIT BINIAZAN, PC**
2100 East Cary Street, Suite 310
Richmond, Virginia 23223
Telephone: (804) 351-9040
Facsimile: (804) 351-9170
Lee@bbtrial.com
Justin@bbtrial.com

Raina C. Borrelli*
Samuel J. Strauss*
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com
sam@straussborrelli.com

**Pro hac vice* forthcoming

*Attorneys for Plaintiff and Proposed Class*